**R.C. JONES, Superior Waste Management Services, Inc. and JTI Contractors, Inc., Appellants,**

**v.**

**REPUBLIC WASTE SERVICES OF TEXAS, LTD. and Rustin Transportation Company, L.P., Appellees.**

No. 01–04–00566–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 2, 2007.

Rehearing Overruled Aug. 30, 2007.

David L. Monroe, John W. Able, Able, Monroe & Walker, P.C., Houston, TX, for Appellants.

Evelyn Ailts Derrington, Neal David Kieval, Phillips & Akers, P.C., Jennifer House, Bingham, Mann, House & Gibson, Paul S. Francis, Baker & Hostetler, LLP, Houston, TX, for Appellees.

Panel consists of Justices JENNINGS, HANKS, and HIGLEY.

## OPINION

GEORGE C. HANKS, JR., Justice.

This is an appeal from a final judgment rendered on a jury verdict in favor of appellees, Republic Waste Services of Texas, Ltd. ("Republic")[1] and Rustin Transportation Company, L.P. ("Rustin"), in a breach of contract and fraud action brought by appellants, R.C. Jones, Superior Waste Management Services, Inc. ("Superior"), and JTI Contractors, Inc. ("JTI"). In two issues, appellants contend that (1) as a matter of law, the evidence is insufficient to support the jury's verdict that Rustin, Republic's subcontractor, did not breach its subcontracts with them by failing to pay them certain rate increases for hauling trash and (2) the trial court erred in denying their motion for new trial on the ground that Rustin's trial counsel engaged in improper and incurable jury argument. We affirm.

## Background

In 1999, the City of Houston began soliciting bids for a long-term contract for disposal of its trash. The proposed 20–year project called for: (1) the construction and operation of two City-owned transfer stations, one in southwest Houston (the Westpark transfer station) and another in southeast Houston (the Lawndale transfer station) and (2) the hauling of trash from these transfer stations to a landfill for disposal. Republic was the low bidder on the City of Houston waste disposal contract. The City estimated Republic's bid amount for the 20–year contract to be $295 million.

All city contracts up for bid must comply with the City's Minority and Women Business Enterprises ("MWBE") Program. Before being awarded a contract, a city contractor must submit an MWBE participation plan, along with either executed subcontracts or letters of intent for each MWBE subcontractor. For the proposed City contract at issue, the City set the MWBE participation requirement as follows: "at least 30% of the total value of all construction subcontracts or supply agreements" and "contracts or supply agreements in at least 20% of the remaining value of this Agreement."

Republic subcontracted all transfer station waste loading and hauling to Rustin, which operates every transfer station in the City of Houston. Ted Meyer, Repub-

---

1. During the pendency of this appeal, appellants dismissed Republic from the appeal.

lic's area president, and Donald Poarch, Rustin's owner, agreed that Rustin, which is not an MWBE, would subcontract with MWBEs to meet the MWBE requirement. Superior, which is owned by R.C. Jones, an African–American, and JTI, which is owned by Jesse Valeriano, an Hispanic, agreed with Rustin to haul waste to Republic's landfill. Both Jones and Valeriano signed blank letters of intent. They understood that the letters of intent were not themselves the agreements, but merely precursors for more extensive and complete agreements.

Once City Council approved the contract with Republic (the "City Contract"), Republic entered into a subcontract with Rustin. The Republic subcontract provided for yearly rate adjustments pursuant to a formula set forth in the City Contract.

JTI and Superior each signed a set of three subcontracts (the "Rustin subcontracts") to perform hauling work at the two City of Houston transfer stations, Westpark and Lawndale. The Rustin subcontracts also provided for yearly rate adjustments "for the applicable year" but did not define that term.

Westpark and Lawndale were scheduled to open in July 2000. However, Westpark did not open until March 9, 2001, and Lawndale did not open until October of that year. Until the Westpark and Lawndale transfer stations opened, JTI and Superior agreed with Rustin to perform hauling work out of other privately-owned transfer stations operated by Rustin including the Sommermeyer/290, Sam Houston, and Friendswood transfer stations.

When the Westpark transfer station opened, Superior took both of its trailers there, and JTI also began hauling from Westpark, although it hauled mostly from the Sommermeyer transfer station. The Rustin subcontracts paid Superior and JTI an initial rate of $5.25 per ton to work out

of Westpark and Lawndale. However, at Westpark, Superior's costs were $6.06 per ton and JTI's costs were $6.78 per ton. At the contracted rate of $5.25 per ton, Superior and JTI were losing money working at Westpark and Lawndale.

Jones recognized that Superior was losing money at Westpark, and he requested a contract directly from Republic's president, Bill Linthicum. Linthicum testified that Jones complained that "his drivers weren't being treated fairly to be allowed to get the same number of loads that the ... Rustin drivers were." Rustin allowed Superior to send one of its trailers back to the more profitable Friendswood transfer station. Both Linthicum and Jones exchanged proposed contracts that proved unacceptable to the other. Jones took his concerns to the Mayor's Office of Affirmative Action and Contract Compliance. Jones was told by the City that, once the Lawndale transfer station opened, he needed to have both of his trucks running from the Lawndale and Westpark transfer stations.

Faced with this dissatisfaction from Superior, Republic and Rustin reviewed their records and discovered that JTI had been overpaid $1.81 per ton for the first four months that Westpark was open, from March 2001 through June 2001. After the overpayment was discovered, Poarch, Rustin's owner, asked Valeriano, JTI's owner, to meet Republic's new area president, Linthicum, to discuss JTI's profitability. Valeriano told them that he was making money. On July 1, 2001, Rustin adjusted the rate that JTI was paid to conform with the figures in the Rustin subcontracts.

When the Lawndale transfer station opened in October 2001, Superior realized that it could not make money hauling from there, either. By the end of the next month, Superior ceased operations and

sued Republic asserting a number of legal theories, all based on a purported contractual and/or partnership relationship arising out of the letters of intent.

While the litigation was ongoing between Superior and Republic, Republic and Rustin asked Valeriano to prepare a profit and loss statement for the individual transfer stations. Valeriano responded that he could not separate it by transfer station. Instead, he spent 10 minutes preparing a profit and loss statement and determined that he was making money on the Rustin work.[2]

One month later, Superior's counsel deposed Valeriano in conjunction with the Superior case against Republic and questioned him at length about the financial statement that he had prepared. Based on the questions he answered during his deposition, Valeriano "felt like [his] price increases hadn't been paid; and in going through that financial statement that [he] had produced, [he] realized that maybe [he] wasn't making money at Westpark like [he] had originally thought [he] was." Valeriano's CPA discovered that JTI was losing money at Westpark and had been underpaid approximately $160,000 in Consumer Price Index ("CPI") rate increases. Valeriano also discovered that he was not getting a 10% participation in the MWBE contract. After an investigation by Rustin in response to JTI's claims, Rustin issued two checks totaling more than $65,000 to one of Valeriano's trucking entities. Because Valeriano cashed the checks and

stopped hauling from the City transfer stations, Rustin believed that the matter was settled. Valeriano notified Rustin that he was terminating his performance under the Rustin subcontracts, but would continue to haul from Sommermeyer.

JTI, who was represented by the same attorney who represented Superior, subsequently intervened in Superior's suit against Republic, and Rustin was brought in as a co-defendant. The parties appeared for trial. During closing argument, Rustin's trial counsel alluded to how appellants' theory of the case was merely a "lawyer's construct" and how Valeriano changed his testimony after meeting with Superior's attorney. After a nearly three-week long trial, the jury rendered a verdict for Republic and Rustin finding that there was no agreement for Superior or JTI to have a 10% participation in the City Contract; that there was no fraud by Republic in signing the letters of intent; and that Rustin had not breached its subcontracts. Superior and JTI filed a motion for new trial and for judgment notwithstanding the verdict that was denied by the trial court.

## CPI Adjustments

In their first issue, appellants contend that they are "entitled to judgment against Rustin on the CPI claims because the unambiguous contracts should be interpreted by the court, and the damages are liquidated and undisputed."[3] We disagree.

---

**2.** Valeriano prepared the financial statement by taking the income that he received from the two transfer stations, calculating that income as a percentage of his total revenue, and then applying that percentage to his costs.

**3.** While the appellants do not specify the procedural vehicle whereby they preserved their matter-of-law point on appeal, the record reflects that they filed a motion for judgment notwithstanding the verdict ("JNOV") assert-

ing that they were entitled to a JNOV on their contract claim against Rustin for CPI adjustment increases. A legal-sufficiency challenge may be preserved by a motion for directed verdict, a motion for judgment notwithstanding the verdict, an objection to submitting an issue to the jury, a motion to disregard a jury finding on an issue, or a motion for new trial. See Cecil v. Smith, 804 S.W.2d 509, 511 (Tex. 1991); C.M. Asfahl Agency v. Tensor, Inc., 135

## Standard of Review

A judgment notwithstanding the verdict ("JNOV") is proper when a directed verdict would have been proper. TEX.R. CIV. P. 301; *Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 394 (Tex.1991). A motion for JNOV should be granted when (1) the evidence is conclusive and one party is entitled to recover as a matter of law or (2) a legal principle precludes recovery. *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 227 (Tex.1990); *John Masek Corp. v. Davis,* 848 S.W.2d 170, 173 (Tex. App.-Houston [1st Dist.] 1992, writ denied). We review the denial of the appellants' motion under the legal sufficiency standard. *See Brown v. Bank of Galveston,* 963 S.W.2d 511, 513 (Tex.1998); *CDB Software, Inc. v. Kroll,* 992 S.W.2d 31, 35 (Tex.App.-Houston [1st Dist.] 1998, pet. denied).

In a legal-sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005). To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the finding means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* This does not mean that a court must disregard all evidence that does not support the finding. *Id.*

S.W.3d 768, 786 (Tex.App.-Houston [1st Dist.]

## Analysis

■ The jury answered the following questions pertaining to Rustin:

### Question 9

Did Rustin fail to comply with the contracts between Superior and Rustin in payment of CPI increases?

It is your duty to interpret the following language of the signed agreements between Rustin and Superior:

"The transportation rate for the applicable Contract Year shall be adjusted...."

You must decide its meaning by determining the intent of the parties at the time of the agreement. Consider all the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties. Answer "Yes" or "No":

Answer: [No]

Jury Question 19 simply replaced "Superior" with "JTI," but was otherwise verbatim. The jury answered Jury Question 19 "No" as well.

■ Superior and JTI each signed a set of three hauling subcontracts with Rustin. Exhibit "A" to each subcontract called for a rate adjustment for "the applicable Contract Year," but did not define that term. Although appellants suggest that we should construe the various contracts at issue as a matter of law, the trial court evidently found language in these contracts ambiguous. In the jury charge, the trial court submitted an instruction that the jury "must decide [the contract's] meaning by determining the intent of the parties at the time of the agreement." *See J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex.2003) (ambiguous

2004, no pet.).

contract creates a fact issue on the parties' intent). Although appellants find it significant that Rustin did not plead ambiguity, a court may conclude that a contract is ambiguous even in the absence of a proper pleading by either party. *Id.* at 231.

Section 6.03 of the City Contract provides for the adjustment of rates "[b]eginning July 1, 2001 and each subsequent July 1, thereafter," in accordance with the CPI formula set forth in Exhibit "H" to the contract. Appellants contend that the Rustin subcontracts should be read together with the City Contracts to ascertain the parties' intent. All six of the Rustin subcontracts were executed at the same time and all say the same thing: Superior's and JTI's rates for the "applicable Contract Year" shall be adjusted using the formula set forth in Exhibit "A." Appellants argue that the language in Exhibit "A" of the Rustin subcontracts "exactly mirrors" the language in Exhibit "H" of the City Contract. Appellants suggest that the Rustin subcontracts should be read in conjunction with the City Contract, which, under its operative provisions, includes a July 1, 2001 effective date for CPI adjustments.

Exhibit "A" to the Rustin subcontracts provides, in part, as follows:

*Cost Adjustment for Transportation Rate:*

The transportation rate for the applicable Contract Year shall be adjusted by the cumulative percent determined as follows:

0.30 times the Labor Index for the applicable Contract Year divided by the Labor Index for March, 1998; plus

0.30 times the Machinery and Equipment Index for the applicable Contract Year divided by the Machinery and Equipment Index for March 1998; plus 0.40 times the Fuel Index for the applicable Contract Year divided by the Fuel Index for March 1998.

Exhibit "H" to the City Contract provides, in part, as follows:

*CPI COST ADJUSTMENT*

The *disposal* rate for the applicable Contract Year shall be adjusted by the cumulative percent determined as follows:

*0.20 times the Construction Index for the applicable Contract Year divided by the Construction Index for March 1998;* plus 0.30 times the Labor Index for the applicable Contract Year divided by the Labor Index for March 1998;

*plus 0.35* times the Machinery and Equipment Index for the applicable Contract Year divided by the Machinery and Equipment Index for March 1998; *plus 0.15* times the Fuel Index for the applicable Contract Year divided by the Fuel Index for March 1998.

(Emphasis added to note the differences in the two provisions.) Appellants find it significant that both exhibits capitalize "Contract Year." They argue that, if the subcontracts and the City Contract are read together and the rate is adjusted on July 1 of each year, Superior is due $77,204 and, after crediting Rustin for its overpayment on the Sommermeyer/Highway 290 route, JTI is due $160,002.[4]

In contrast, both Rustin's president, Sid Sherwood, and owner, Donald Poarch, testified that its intent was for Superior and JTI to get increases when Rustin received its increases under Rustin's various contracts.[5] The appellants argue that, if

---

4. Rustin's CFO, Jim Goodyear, agreed with the calculations from Greg Brown, appellants' accounting expert, based on a July 1, 2001

effective date. However, he took issue with the July 1, 2001 effective date.

5. Sherwood testified that he was under the impression that, when Rustin got a rate in-

there is an ambiguity, "a possible interpretation of 'applicable Contract Year' is that Superior and JTI were to receive rate adjustments on each route when Rustin received its adjustments from its customers." Using these dates for adjustments, the appellants assert that Superior is due $72,618 and JTI is due $154,987.96.

Finally, appellants state that "the only other interpretation for the 'applicable Contract Year' is that the rate increases were to be paid one year after actual work began on each route." Appellants contend, however, that this interpretation is unreasonable when viewed in light of the context of the other contemporaneous contracts and circumstances. In summary, appellants argue that, under any interpretation, Rustin breached its contracts and failed to pay the adjustments.

Rustin asserts that neither Superior nor JTI was entitled to any adjustments because (1) Superior stopped hauling before any CPI increases became due and (2) JTI "was brought up to date on all its CPI increases in February 2003, after it quit hauling from all but the Sommermeyer transfer station, for which it had been previously overpaid." In June 2001, Poarch's CPA, Jim Pouns, proposed to Republic's president, Bill Linthicum, that Rustin receive a rate increase. Pouns asked for a delay on any increases, and Pouns asked Linthicum what constituted the "applicable Contract Year" for purposes of CPI adjustments under Superior's contracts with Rustin. Linthicum responded via e-mail that he thought the "applicable Contract Year" meant the "initial operating date," which, for the City-owned transfer stations, was March 9,

2001, when the Westpark transfer station was opened. Linthicum's e-mail stated that "I have read the contract between Rustin and Superior, and I interpret the contract year as March 9, 2001, though March 8, 2002. There is nothing in the contract defining 'contract year.' Superior Waste Management stated this contract began on March 9th, 2001, not when the agreement was signed." Accordingly, Linthicum instructed Rustin to prepare for a CPI adjustment for Superior in March 2002, and, as is standard in the trucking industry, only if Superior requested one.[6] Neither Superior nor JTI requested a CPI increase either in July 2001 or March 2002.

Jones's first formal request for a rate increase was in a demand letter sent by his attorney in August 2002 after Superior had already stopped hauling for Rustin. Sid Sherwood, Rustin's president, responded and explained that Superior was not due any adjustments using the base year 2000 because decreases in the fuel index—the most heavily-weighted index under the Rustin subcontracts—offset any increases in other indices. However, Superior's inquiry prompted Sherwood to ask Jim Goodyear to review JTI's numbers to determine if JTI was being paid the proper rate. Using March 1, 2002 as the initial due date for CPI adjustments and the CPI formula in the Rustin subcontracts, Goodyear found that JTI was underpaid on some routes and overpaid on others (namely, Sommermeyer), and he prepared a schedule of price increases for JTI, effective on September 1, 2002.

Goodyear testified that he used the date of March 1, 2002 to calculate the CPI

---

crease, JTI and Superior would get an increase, but he changed his understanding when "it was pointed out to me in the contract."

6. Linthicum testified that, "in our business, in the waste hauling business, all CPIs are—it is the burden of the person contracting the services to request CPIs, whether they are increases or decreases. It is standard in the industry."

adjustments because that date was the one-year anniversary of the opening of Westpark; in other words, it was the first due date for an adjustment based on a March 1, 2001 "Initial Operating Date."[7] Consequently, Rustin issued two checks to JTI totaling more than $65,000. With respect to Superior, Goodyear indicated that it was not entitled to adjustments because it was no longer hauling for Rustin as of March 1, 2002.

Appellants have presented at least three different versions of how the contract could have been interpreted. Rustin presented evidence from, among others, Jim Goodyear and Bill Linthicum who both testified that it was their understanding and impression that the adjustment date should be March 2002, if requested by JTI and Superior. We must assume that the jury resolved disputed facts in favor of its finding. *See City of Keller*, 168 S.W.3d at 822. After reviewing the record in the light most favorable to the jury's finding and disregarding all evidence that a reasonable factfinder could have disbelieved or found to be incredible, we hold that the evidence is legally sufficient to support the judgment and the trial court did not err in denying the appellants' motion for directed verdict.

We overrule appellants' first issue.

### Incurable Jury Argument

In their second issue, appellants argue that the trial court erred in denying their motion for new trial because "the false accusations against counsel for Superior and JTI that he had suborned perjury" made by counsel for appellees in closing argument, "constitute incurable, reversible error." Appellants argue that "House committed incurable reversible error by accusing John Able (Rustin's trial counsel) of suborning perjury." "Attacks upon the integrity of opposing counsel are categorically prohibited." Appellants further argue that "Ms. House planned this argument. She attempted to plant the seed of some improper conduct by Mr. Able during her cross. She then argued it as fact during her closing argument." Appellants contend that, because the evidence "absolutely establishes that Rustin failed to pay the contracted rate for services to Superior or JTI," it is impossible to conclude that the jury was not influenced by the "outrageous accusation" against Superior and JTI's lawyer. We disagree.

### Closing Argument and Motion for New Trial

In closing argument, Republic's counsel commented that "[t]his case is a construction of attorneys, trying to turn a letter of intent into something entirely unintended by any of the parties." Next, Rustin's counsel, Jennifer House, stated

> [House]: [Republic's lawyer] alluded to the fact that this case is a lawyer's construct, it is created by lawyers. I am proud to be a lawyer. I take no pride in accusing other lawyers of wrongdoing, but I cannot help but have difficulty with the fact that Rustin never made representations to these minority subcontractors that they were going to be entitled to overall 20 percent participation of $295 million.
>
> . . .
>
> And when [Valeriano] testified in October of 2002 that he was operating profitably from Westpark and Lawndale, he was telling the truth.

---

7. Westpark actually opened on March 9, 2001, but it was easier to calculate from the first of the month.

Why did the story change, then? Why did the story change? Because he met Mr. Able and Mr. Able said, "Jesse, by the way, did you know under our theory you are entitled to $5 million of profit over 20 years?"

[Able]: Objection, Your Honor. There is no evidence that I told him anything.

[Trial Court]: Sustained.

[House]: Suddenly—and you heard the testimony. Mr. Able questioned him, and the testimony was he met with Mr. Able after his deposition. Do you know who else he met with? The gentleman sitting in this corner right here, Greg Brown, CPA.

. . .

And I will tell you why he is a party to this lawsuit. Because the couple of hundred thousand dollars that he was going to make or was making with Rustin, vis-a-vis the existing work that he was doing, in his mind was peanuts compared to the $5 million that he was going to ask you for under the trumped up claim that he was entitled to 10 percent of $295 million over 20 years. And that's why the story changed, and that's why we are here.

After nearly three weeks of trial, the case was submitted to the jury on issues primarily relating to whether the Letters of Intent gave rise to a contract between Republic and Superior and/or JTI, whether Republic breached that contract, whether Republic committed fraud in connection with the Letters of Intent, and whether Rustin breached its subcontracts with Superior and JTI to pay CPI increases. By an 11–1 verdict, the jury found in favor of Republic and Rustin on all issues.

Appellants filed their motion for new trial, alleging, among other things, that House's closing argument constituted incurable, reversible error. After significant briefing and two hearings, the trial court denied the motion. In its order, the trial court stated that

the court considered the entire record and believes that the evidence supports the jury verdict and was not the result of the improper, inflammatory jury argument made by Jennifer House.

The court has reviewed all of the evidence in the case supporting the jury verdict and finds that there is more than sufficient evidence to support the verdict. The court also notes that the inflammatory argument was of short duration, was not repeated, and an objection to the argument was promptly sustained. There was also evidence that Mr. Valeriano's testimony did change. The court finds that the probability that the jury verdict was grounded on proper evidence is greater than the probability that the verdict was based on the improper argument.

But let there be no doubt that the argument was improper. And although Ms. House in oral argument stated that she "was stunned by the seriousness with which the Court regarded the allegations," the denial of the new trial does not mean that the court condones this type of argument. Attacks on opposing counsel are error. (citations omitted)

In Ms. House's argument she completely concocted a conversation between the plaintiff's counsel, Mr. Able, and the plaintiff, Mr. Valeriano, and implied that Mr. Able suborned perjury. Ms. House stated in closing argument "Why did the story change, then? Why did the story change? Because he met Mr. Able and Mr. Able said, 'Jesse, by the way, did you know under our theory you are entitled to $5 million of profit over 20 years?'"

What is most disturbing is Ms. House's attempt to explain away this made-up conversation. In her brief and in her oral argument before the court she attempted to justify her statement, claiming it was based on questions asked by Mr. Able in a deposition. The court has reviewed the entire deposition of Mr. Valeriano and there is no reference to such a question or statement or meeting. And most certainly there was no evidence before the jury of such a question or statement or meeting. Ms. House continues her misstatements in her briefing. At page 5 of her brief, Ms. House says, "each and every questioned statement made by Ms. House is in the record and is based in fact." There is absolutely no evidence in the record of such a meeting or such a statement.

At oral argument, realizing that the court was skeptical that questions were asked in a deposition would be considered a meeting, Ms. House then argues that Mr. Able and Mr. Valeriano must have met to form the attorney client relationship and that such a meeting could be inferred from the fact that Mr. Valeriano became Mr. Able's client. While undoubtedly there were many meetings between Mr. Able and Mr. Valeriano, (although of course there is no evidence in the record of such meetings) what Ms. House fabricated was the content of such a meeting and the implication that Mr. Able suborned perjury and induced Mr. Valeriano to change his story.

Lawyers, in the heat of battle, do make misstatements of fact and law, and unwarranted personal criticisms. But they should not compound their errors in legal briefs filed after careful reflection. And they should not impugn the rest of their law firm by making an irrelevant argument that "all of my part-ners were 100% behind my representation."

## Standard of Review

We review the denial of a motion for new trial to determine if the trial court abused its discretion. *Champion Int'l Corp. v. Twelfth Court of Appeals,* 762 S.W.2d 898, 899 (Tex.1988) (orig.proceeding). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or if it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985).

To obtain reversal of a judgment on the basis of improper jury argument, a complainant must prove (1) an error; (2) that was not invited or provoked; (3) that was preserved at trial by a proper objection, motion to instruct, or motion for mistrial; (4) that was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the trial court; and that (5) the argument by its nature, extent, and degree constituted reversibly harmful error. *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 839 (Tex.1979). Reversal is proper only upon a showing that "the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence." *Id.* at 840.

## An Error

To obtain reversal, appellants must first prove "an error" that was not "invited or provoked." *Id.* at 839. Counsel must confine argument "strictly to the evidence and to the arguments of opposing counsel." Tex.R. Civ. P. 269(e). Criticism, censure, or abuse of counsel is not permitted. Appeals to passion and prejudice are improper, as are calls to punish a litigant for the acts of counsel. Tex.R. Civ. P. 269;

Tex. Disciplinary R. Prof'l Conduct 3.04 (1990), *reprinted in* Tex. Gov't Code Ann. tit. 2, subtit G. app. A (Vernon 2005) (Tex. State Bar R. art. X, § 9).

■ In this case, there was no evidence of any post-deposition meeting between Valeriano and his attorney. House's assertion that Valeriano's testimony changed "because he met Mr. Able and Mr. Able said, 'Jesse, by the way, did you know under our theory you are entitled to $5 million of profit over 20 years?'" and her decision to repeat Republic's statement that this "case is a lawyer's construct" constituted improper jury arguments. *See id.* House's closing arguments were not confined "to the evidence and to the argument of opposing counsel," and thus violated rule 269(e). No one argues that the error was invited or provoked.

**Preservation of Error**

■ Appellants must next prove either that the uninvited error (1) was preserved at trial by a proper objection, motion to instruct, or motion for mistrial or (2) was not curable by an instruction, a prompt withdrawal of the statement or a reprimand by the trial court. *Standard Fire Ins. Co.*, 584 S.W.2d at 839. If a party is to preserve error, an objection must be made when the improper argument occurs, unless the conduct or comment cannot be rendered harmless by proper instruction. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex.2001). The burden to prove that improper argument was incurable rests on the claimant. *See Gen. Motors Corp. v. Grizzle*, 642 S.W.2d 837, 845 (Tex.App.-Waco 1982, writ dism'd).

■ Appellants made one objection to the argument, and the trial court sustained the objection; however, appellants failed to request that the trial court instruct the jury to disregard the argument. Appel-

lants did not request any relief from the trial court regarding these comments until their motion for new trial, after the jury had returned a verdict. Thus, to prevail, appellants must show that the statements constituted incurable jury argument. *See Busse v. Pac. Cattle Feeding Fund No. 1, Ltd.*, 896 S.W.2d 807, 815 (Tex.App.-Texarkana 1995, writ denied) (stating failure to press for instruction at time of erroneous jury argument operates as waiver of any possible complaint about argument).

■ Improper jury arguments can be either curable or incurable. *Otis Elevator Co. v. Wood*, 436 S.W.2d 324, 333 (Tex.1968). A jury argument is "curable" when its harmful effect can be eliminated by instructing the jury to disregard what they have just heard. *Id.* However, when an argument is so inflammatory that its harmfulness could not be eliminated by an instruction to the jury to disregard it, the prejudicial nature of the argument is so acute that it is "incurable." *Id.* If an argument is considered to be curable, counsel must make a prompt objection to it *and* request an instruction, or the error is waived. *Id.* When an argument is incurable, a failure to object does not result in a waiver, under the reasoning that "counsel making the argument is the offender so the law will not require opposing counsel to take a chance on prejudicing his cause with the jury by making the objection." *Id.* Whether an argument is incurable depends on "the degree of prejudice flowing from the argument—whether the argument, considered in its proper setting, was reasonably calculated to cause such prejudice to the opposing litigant that a withdrawal by counsel or an instruction by the court, or both, could not eliminate the probability that it resulted in an improper verdict." *Id.*

■ Here, to decide whether the jury argument was incurable, we examine the record to determine whether an instruction to disregard House's improper arguments would have sufficiently remedied the harm. *See Standard Fire Ins. Co.*, 584 S.W.2d at 839; *Goswami v. Thetford*, 829 S.W.2d 317, 321 (Tex.App.-El Paso 1992, writ denied). Only rarely will an improper argument so prejudicially influence the jury that the error cannot be cured. *Standard Fire Ins. Co.*, 584 S.W.2d at 839; *see Tex. Employers' Ins. Ass'n v. Guerrero*, 800 S.W.2d 859, 862–67 (Tex.App.-San Antonio 1990, writ denied) (holding intentional appeal for verdict based on parties' race or ethnicity is incurable); *Howard v. Faberge, Inc.*, 679 S.W.2d 644, 649–50 (Tex. App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.) (holding demonstration of product's inflammability by counsel's attempt to ignite his arm during closing argument was incurable when experiment was not cumulative of evidence adduced during trial); *In re W.G.W.*, 812 S.W.2d 409, 415–16 (Tex. App.-Houston [1st Dist.] 1991, no writ) (holding in custody dispute that attempt to link mother's cervical cancer to immoral conduct was incurable because there was no evidence to support such connection).

■ Improper argument regarding the alleged wrongful conduct by a lawyer is not *per se* incurable. As Texas courts have held, "charges that opposing counsel manufactured evidence, suborned perjury, or was untruthful are highly improper and are *generally* considered to be incurable." *Yoakum*, 826 S.W.2d. at 758 (emphasis added). To determine whether a specific instance of accusing opposing counsel of suborning perjury is incurable, we must examine all of the circumstances surrounding the making of the statement to determine if the comment was so inflammatory that its perceived prejudicial effect could not have been cured by an instruction to the jury. *Standard Fire Ins. Co.*, 584 S.W.2d at 840.

Under the facts of this case, House's comments were curable. To preserve error, appellants should have timely objected to the comments and sought an appropriate instruction from the trial court who, after listening to all of the evidence and the offending comments and viewing the jury's reaction to the comments, was in the best position to fashion the appropriate remedy for the transgression and punish counsel for her conduct. Appellants should not have waited until after the jury had returned with its verdict to seek relief for House's clearly improper argument.

While House's comments were reprehensible, the comments were short in duration and occurred at the very end of almost three weeks of trial after the jury had heard all of the evidence, including evidence that clearly contradicted House's accusations of perjury. Although the record indisputably reveals that Valeriano did testify differently when deposed during the suit between Superior and Republic and later when JTI intervened in the suit against Republic and Rustin, Valeriano presented the jury with an arguably legitimate explanation for the change in his position.[8] Thus, the jury could have, with the proper instruction, found House's arguments to be deliberately false and in bad faith. Furthermore, contrary to House's apparent implications, the issue of the

---

**8.** At trial, Valeriano testified that, when he was deposed, he was under the impression that the Westpark route was profitable. He had not evaluated the various routes separately. Based on the line of questions posed to him during his deposition, he determined that he needed to have an accountant audit the individual routes. He testified at trial that, only after he was able to take the time to do so, he discovered that the Westpark route was not, in fact, profitable.

changed testimony was not dispositive of the jury's determination of this case. This issue went to appellants' theory of damages, how much appellants were entitled to recover, which the jury never reached per the court's instructions. The changed testimony did not go to the issue of liability that was reached by the jury—whether there was a breach of contract regarding CPI adjustments and the requisite contractual percentage of income that appellants were required to make under their contracts with Rustin. Of particular importance is the fact that at no time did the trial court in any way condone or show approval for the comments in front of the jury and thus its ability to issue a curative instruction was not impaired. *See Yoakum,* 826 S.W.2d. at 758–59. Appellants' only objection was immediately sustained by the court, and appellants elected not to pursue the matter any further by requesting an instruction to disregard or a reprimand from the court.

Under these facts, House's comments were not so inflammatory that their perceived prejudicial effect would have prevented the jury from following its oath with the proper instructions from the judge. Appellants could have requested the trial court to instruct the jury that "the record does not show any post-deposition meeting or conversations between Mr. Able [appellants' counsel], his retained accounting experts, and Mr. Valeriano and to disregard any reference to such meeting or conversations between any of them." Appellants could have gone further by asking the trial court to instruct the jury that it was improper for House to impute wrongdoing of any kind to appellants' counsel. The trial court, if it had been timely requested to do so, could have also admonished House that any further argument along such lines would result in a mistrial. In this case, the timely request for relief regarding an imaginary post-deposition meeting or conversation would not have prejudiced appellants' case in front of the jury. *See General Motors Corp. v. Iracheta,* 161 S.W.3d 462, 472 (Tex.2005) (held comments before closing arguments made in Spanish by party, not his counsel, directly to a Spanish speaking jury were incurable.)

Appellants' reliance on the holdings in *Yoakum* and *Stephens v. Smith,* 208 S.W.2d 689 (Tex.Civ.App.-Waco 1948, writ ref'd n.r.e.) to support the conclusion that House's comments constituted incurable error is misplaced. The facts of those cases are clearly distinguishable from the facts in this case. In both of the cases in which the appellate courts found allegations that counsel manufactured evidence at trial to be incurable, the trial court, by its conduct, erroneously condoned or implied to the jury that the conduct was proper. Accordingly, the trial court's ability to fashion an appropriate instruction was impaired. In *Yoakum,* not only did the trial court erroneously prevent counsel from arguing that allegations of manufactured evidence by opposing counsel was error, but the offending counsel referred to the trial court's rulings to bolster his allegations in front of the jury. *Yoakum,* 826 S.W.2d at 758. Likewise in *Stephens,* the court overruled attempts by opposing counsel to correct the error of counsel's arguments that he "deliberately planted a lie in the mouth of a witness." *Stephens,* 208 S.W.2d at 691. In other cases cited by appellants, in which allegations that counsel manufactured and/or destroyed evidence were found to be incurable, either additional facts impaired the trial court's ability to give an effective curative instruction, or the length of the improper argument made an effective curative instruction impossible. *See Howsley & Jacobs v. Kendall,* 376 S.W.2d 562, 566 (Tex.1964) (held that counsel's comments were incura-

ble when, during closing argument, counsel asked the jury who was more likely to be telling the truth—a man on his deathbed "about to come face to face with his Master" or "a colored boy who had been under the coaching of this battery of lawyers, when he got on there to give words that were not his words."); *Montgomery Ward & Co. v. Brewer,* 416 S.W.2d 837, 845–48 (Tex.Civ.App.-Waco 1967, writ ref'd n.r.e.) (held as incurable repeated accusations throughout closing argument that opposing counsel had destroyed key evidence as to the issue of liability and the pointing directly to counsel while making these accusations).

Because we hold that the error was curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the trial court, the appellants were required to object, request an instruction to disregard, and request a motion for mistrial. *Standard Fire Ins. Co.,* 584 S.W.2d at 839. By failing to do so, appellants have waived this error. *Id.* We overrule appellants' second issue.

**Harm**

 Finally, assuming that the error had been preserved, appellants must prove that "the argument by its nature, extent, and degree constituted reversibly harmful error." *Id.* On appeal, we must evaluate the improper argument in light of the entire case, from voir dire to closing arguments. *Luna v. North Star Dodge Sales, Inc.,* 667 S.W.2d 115, 120 (Tex.1984). The test is whether a juror of ordinary intelligence would have been persuaded by the improper argument to agree to a verdict contrary to that to which the juror would have otherwise agreed. *See Tex. Employers Ins. Ass'n v. Puckett,* 822 S.W.2d 133, 136 (Tex.App.-Houston [1st Dist.] 1991, writ denied).

We have reviewed the entire record, and we agree with the trial court's finding that

[t]he court has reviewed all of the evidence in the case supporting the jury verdict and finds that there is more than sufficient evidence to support the verdict. The court also notes that the inflammatory argument was of short duration, was not repeated, and an objection to the argument was promptly sustained. There was also evidence that Mr. Valeriano's testimony did change. The court finds that the probability that the jury verdict was grounded on proper evidence is greater than the probability that the verdict was based on the improper argument.

Accordingly, we hold that the trial court did not err in denying appellants' motion for new trial. *See Standard Fire Ins. Co.,* 584 S.W.2d at 840 (for reversal, must show probability that improper argument caused harm greater than probability verdict grounded on proper proceedings and evidence).

We overrule appellants' second issue.

**Conclusion**

We affirm the judgment of the trial court.

Justice JENNINGS, dissenting.

TERRY JENNINGS, Justice, dissenting.

The trial court expressly found that trial counsel for appellee, Rustin Transportation Company, L.P. ("Rustin"), in her jury argument, "completely concocted" facts and implied that trial counsel for appellants, R.C. Jones, Superior Waste Management Services, Inc. ("Superior"), and JTI Contractors, Inc. ("JTI"), "suborned perjury." The trial court further found the argument, based on a "made-up conversation," to be "improper" and "inflammatory."

Although the majority agrees that the accusations of suborning perjury were "reprehensible," it concludes, in violation of Texas Supreme Court precedent, that the "improper, inflammatory" jury argument was "curable" and that by failing "to object, request an instruction to disregard, and request a motion for mistrial," appellants waived any error for our review. It compounds this error by actually suggesting, without any authority, that appellants should have requested specific instructions to cure the false allegations of suborned perjury. The majority further errs in holding alternatively that the trial court did not err in denying appellants' motion for new trial. It reaches this result by conducting a conclusory harm analysis, merely quoting the trial court's finding that the jury's verdict was probably grounded on proper evidence.

Under the majority's analysis, virtually any "reprehensible" and "improper, inflammatory" jury argument could be cured. The majority's error will serve to encourage more such arguments and is, thus, of such importance to the State's jurisprudence that it should be corrected. Accordingly, I respectfully dissent.

### Background

Appellants sued Republic Waste Services of Texas, Ltd. ("Republic") and Rustin for breach of contract and fraud. The City of Houston, pursuant to its Minority and Women Business Enterprises Program ("MWBE"), requires City contractors to sign "Letter of Intent" agreements with minority-owned subcontractors and to submit the agreements and a MWBE participation plan to the City when bidding on certain city contracts. Republic obtained a 20–year waste disposal contract with the City for a bid amount of $295 million, and it subcontracted with Rustin for transfer station loading and hauling of waste. Jones, an African–American who owns Superior, and Jesse Valeriano, a Hispanic who owns JTI, signed Letters of Intent, agreeing to haul waste to Republic's landfill.

Appellants alleged that Republic breached the agreements, "which granted Superior and JTI each 10% participation" as minority-owned subcontractors in Republic's 20–year waste disposal contract with the City. Appellants also alleged that both Republic and Rustin "never intended for Superior and JTI to participate in 10% of the [City] Contract" and that Rustin breached its subcontracts with them by failing to pay them annual consumer price index ("CPI") rate adjustments.

Superior and JTI each signed three hauling subcontracts with Rustin. The "intent of the parties" regarding the payment of CPI increases was hotly contested. Appellants presented evidence that their subcontracts with Rustin should have been read together with Republic's contract with the City to ascertain the parties' intent about CPI rate adjustments, i.e., that the rates be adjusted "[b]eginning July 1, 2001 and each subsequent July 1, thereafter." Rustin presented evidence that Superior and JTI were to receive rate increases only when Rustin received a rate increase.

At the conclusion of a three-week long trial, the trial court submitted the case to the jury on issues as to whether the parties actually reached certain agreements, whether Republic failed to comply with them, whether Republic committed fraud, and whether Rustin was part of a conspiracy to commit fraud. In the issues concerning the contracts between appellants and Rustin, the trial court instructed the jury to interpret the meaning of the lan-

guage in the signed agreements.[1] The trial court concluded that the pertinent contracts were ambiguous and that the jury had to determine the intent of the parties.[2] In an eleven to one verdict, the jury answered all of the liability questions against appellants.

### The "Reprehensible" and "Improper, Inflammatory Jury Argument"

From the outset, the pervading theme of the jury argument of Rustin's trial counsel, Jennifer House, was that "this case is a lawyer's construct, *it is created by lawyers.*" (Emphasis added.) After noting that, because of the trial, she did not have time to put away her Christmas ornaments, House lamented, "There is something *very, very wrong with what has happened in this case.* There is something wrong about an individual who has fought for his country, been wounded three times, to be accused of fraud in the operation of his business, *to benefit people who don't want to work and who are expecting a windfall.*" (Emphasis added.)

After discussing some of the fraud allegations and some of the evidence in favor of her client, House launched, full force, into her attack on opposing counsel, John Able, and appellants' case:

> [Ms. House]:.... I am proud to be a lawyer. I take no pride in *accusing other lawyers of wrongdoing,* but I cannot help but have difficulty with the fact that Rustin never made representations to these minority subcontractors that they were going to be entitled to overall 20 percent participation of $295 million.
>
> ....
>
> Mr. Jones ... was going to punish these companies every step of the way *because he believed that there wouldn't be 12 of you in this box smart enough to understand what happened.* But you are smart enough....

And when [Valeriano] testified in October of 2002 that he was operating profitably from Westpark and Lawndale, he was telling the truth.

> *Why did the story change, then? Why did the story change? Because he met Mr. Able and Mr. Able said, "Jesse, by the way, did you know under our theory you are entitled to $5 million of profit over 20 years?"*
>
> [Mr. Able]: Objection, Your Honor. There is no evidence that I told him anything.
>
> [Trial Court]: Sustained.

After the trial court sustained Able's objection, House, without skipping a beat, continued:

> [Ms. House]: Suddenly—and you heard the testimony. Mr. Able questioned him, and the testimony was he met with Mr. Able after his deposition. Do you know who else he met with? The gentleman sitting in this corner right here, Greg Brown, CPA.

---

1. For example, the trial court submitted question 9 as follows:
 Did Rustin fail to comply with the contracts between Superior and Rustin in payment of CPI increases?
 It is your duty to interpret the following language of the signed agreements between Rustin and Superior:
 "The transportation rate for the applicable Contract Year shall be adjusted...."
 You must decide its meaning by determining the intent of the parties at the time of the agreement. Consider all the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties.

2. *See J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex.2003).

Now it is interesting.... [Valeriano] needs a new CPA and—he needs a new attorney, Mr. Able, and a new CPA. And *suddenly the entire story changes.* And *suddenly* in February of 2003, a couple of months later, *he is a party to this lawsuit.*

. . . .

*And I will tell you why he is a party to this lawsuit.* Because the couple of hundred thousand dollars that he was going to make or was making with Rustin, vis-a-vis the existing work that he was doing, in his mind *was peanuts compared to the $5 million that he was going to ask you for under the trumped up claim* that he was entitled to 10 percent of $295 million over 20 years. And *that's why the story changed, and that's why we are here.*

(Emphasis added.)

In comparing the credibility of Jim Goodyear, a Rustin witness, with that of Valeriano, House noted that when Goodyear met with Valeriano, Valeriano did not ask for "10 percent of $295 million." She stated,

[Ms. House]: He never said that. *It is a construct.* That idea happened later. It didn't happen in the beginning. It wasn't part of the negotiations. It happened later. *It was an idea that occurred, I submit, with the participation of lawyers and accountants.*

(Emphasis added.)

In summing up for the jury, House emphasized, "Ladies and gentlemen of the jury, everything I have told you and argued to you in these brief moments is supported by these written documents, *not a construct of mine at all.*" (Emphasis added.)

House's theme, from start to finish, was that appellants' case, based on suborned perjury, was "a lawyer's construct," a "trumped up claim" of their "lawyers and accountants." In complete contrast, Rustin's defense was "not a construct ... at all." Thus, the trial court's and the majority's findings that the improper and inflammatory argument was "short in duration" and was "not repeated" are patently wrong.

In their new trial motion, appellants asserted that House's improper argument caused them incurable harm. *See* Tex.R. Civ. P. 324(b)(5). The trial court, in its order denying the motion, stated that it did not believe that the jury's verdict was "the result of *the improper, inflammatory jury argument* made by Jennifer House." (Emphasis added.) Nevertheless, the trial court went on to note,

But let there be no doubt that *the argument was improper.* And although Ms. House in oral argument stated that she "was stunned by the seriousness with which the Court regarded the allegations," the denial of the new trial does not mean that the court condones this type of argument. *Attacks on opposing counsel are error. ...*

In Ms. House's argument *she completely concocted a conversation between the plaintiff's counsel, Mr. Able, and the plaintiff, Mr. Valeriano, and implied that Mr. Able suborned perjury.* Ms. House stated in closing argument "Why did the story change, then? Why did the story change?" Because he met Mr. Able and Mr. Able said, "Jesse, by the way, did you know under our theory you are entitled to $5 million of profit over 20 years?"

What is most disturbing is Ms. House's attempt to explain away this *made-up conversation.* In her brief and in her oral argument before the court she attempted to justify her statement, claiming it was based on **questions**

asked by Mr. Able in a deposition. *The court has reviewed the entire deposition of Mr. Valeriano and there is no reference to such a question or statement or meeting. And most certainly there was no evidence before the jury of such a question or statement or meeting.* Ms. House continues her misstatements in her briefing. At page 5 of her brief, Ms. House says, "each and every questioned statement made by Ms. House is in the record and is based in fact." *There is absolutely no evidence in the record of such a meeting or such a statement.*

At oral argument, realizing that the court was skeptical that questions [that] were asked in a deposition would be considered a meeting, Ms. House then argues that Mr. Able and Mr. Valeriano must have met to form the attorney client relationship and that such a meeting could be inferred from the fact that Mr. Valeriano became Mr. Able's client. While undoubtedly there were many meetings between Mr. Able and Mr. Valeriano, (although of course there is no evidence in the record of such meetings) *what Ms. House fabricated was the content of such a meeting and the implication that Mr. Able suborned perjury and induced Mr. Valeriano to change his story.*

(Citations omitted) (emphasis added).

### Incurable Harm = Reversible Harm

In their first issue, appellants argue that the trial court erred in denying their new trial motion because trial counsel for Rustin falsely accused their counsel of "suborning perjury, thereby violating the most basic tenets of fundamental fairness and rendering the proceedings patently unfair." They assert that, given the seriousness of House's unsupported allegations of perjury, damage to their case should be presumed as a matter of law. In fact, how can such a "reprehensible"

and "improper, inflammatory jury argument," not be harmful to a litigant's case?

In cases involving improper jury argument, an appellant must show "a number of things." *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 839 (Tex.1979). As noted by the Texas Supreme Court in *Reese,* generally,

> He has the burden to prove (1) an error (2) that was not invited or provoked, (3) that was preserved by the proper trial predicate, such as an objection, a motion to instruct, or a motion for mistrial, and (4) was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the judge.... *There are only rare instances of incurable harm from improper argument.* The complainant has the further burden to prove (5) that the argument by its nature, degree and extent constituted reversibly harmful error. How long the argument continued, whether it was repeated or abandoned and whether there was cumulative error are proper inquiries. All of the evidence must be closely examined to determine (6) the argument's probable effect on a material finding. (7) Importantly, a reversal must come from an evaluation of the whole case, which begins with the voir dire and ends with the closing argument. The record may show that the cause is weak, strong, or very close. From all of these factors, the complainant must show that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence.

*Id.* at 839–40 (citations omitted) (emphasis added). This language has been described as "unusually broad," "remarkable," and "confusing." Roger D. Townsend, *Improper Jury Argument and Professionalism: Rethinking Standard Fire v. Reese,*

67 Tex. B.J. 448, 449–50 (June 2004). However, after stating the above, the supreme court clarified:

> The injection of new and inflammatory matters into the case through argument has in exceptional instances been regarded as *incurable by an instruction.* An appeal to racial prejudice falls into the category. . . . The use in argument of the epithets, "liar," "fraud," "faker," "cheat," and "imposter" in disregard of objections that were made was harmful. . . . *The unsupported charge of perjury was incurable.* . . . Those cases . . . show that an affront to the court and the equality which it must portray will be dealt with harshly.

*Reese,* 584 S.W.2d at 840 (citations omitted) (emphasis added).

As noted by then Justice David Peeples in *Texas Employers' Insurance Association v. Guerrero,* "Clearly an incurable argument does not require an objection, but to go further and hold that an argument can be incurable and yet harmless is a contradiction in terms." 800 S.W.2d 859, 863 (Tex.App.-San Antonio 1990, writ denied). Thus, the court held that "incurable does not mean simply that no objection need be made; it also means that *the argument's harmfulness, its reversible impact,* cannot be cured or corrected by an instruction." *Id.* at 864 (emphasis added). As previously explained by the supreme court,

> Improper jury arguments are usually referred to as one of two types: "curable" or "incurable." A jury argument is *"curable"* when the *harmful effect* of the argument can be eliminated by a trial judge's instruction to the jury to disregard what they have just heard. The error is *"cured"* and *rendered harmless* by the instruction. On the other hand, an argument may be so inflammatory that its *harmfulness* could not be eliminated by an instruction to the jury to disregard it. The *prejudicial nature* of the argument is so *acute* that it is *"incurable."*

*Otis Elevator Co. v. Wood,* 436 S.W.2d 324, 333 (Tex.1968) (emphasis added).

In *Howsley & Jacobs v. Kendall,* a plaintiff's lawyer argued to the jury that "[s]omebody was testifying through the lips of" a critical witness and that witness testified "under the coaching of this battery of lawyers." 376 S.W.2d 562, 565–66 (Tex.1964). The Texas Supreme Court concluded that "[a]n assertion of facts having no evidentiary basis were placed before the jury and these asserted facts were in turn made the basis of an inflammatory appeal." *Id.* at 566. It therefore held that "[n]o instruction of the trial judge could have removed the prejudicial effects of the argument and hence no objection was necessary to preserve the error." *Id.* Why? Because the prejudicial harm from such an inflammatory argument is readily apparent:

> It is our opinion that *from the time the charge was made* that someone else was testifying though the lips of [the witness], coupled with the statement as to a 'battery of lawyers,' the [defendant]'s case was irretrievably prejudiced.

*Id.* (emphasis added).

Likewise, here, "from the time" that the unsupported allegation of suborned perjury "was made," appellants' case was "irretrievably prejudiced." Contrary to the majority's representation that "the issue of the changed testimony . . . went to appellants' theory of damages," Ms. House did not so limit her improper argument. She characterized appellants' entire case as a lawyer's construct, based on suborned perjury. Although on point and controlling, the majority merely mentions *Howsley & Jacobs* in a parenthetical. Ignoring the supreme court's holding that "no instruc-

tion" could remove the prejudicial effects of such "an inflammatory appeal," the majority compounds its error by crafting its own instructions to cure the "perceived prejudicial effect" of House's comments. In fact, instructing the jury that "it was improper for House to impute wrongdoing of any kind to appellants' counsel" and that "any further argument along such line would result in a mistrial," would, as illustrated in *Howsley & Jacobs,* have done nothing to remove the prejudicial effects of the inflammatory argument.

This case, involving allegations of breach of contract and fraud, like most cases actually tried to a jury, boiled down to the credibility of the witnesses. The jury was asked to decide whether the parties had actually reached certain agreements, to interpret the agreements to ascertain the intent of the parties, to decide whether the defendants breached any agreements, and to determine whether the defendants engaged in fraud. The credibility of appellants was obviously critical in deciding these issues, especially in light of the fact that the jury was asked to determine whether the parties had actually reached certain agreements and the intent of the parties about their agreements. There can be no doubt but that a juror, even after receiving the majority's proposed instructions, would place considerable weight on House's inflammatory comments. How could a juror not be influenced by her assertion that appellants' entire case was a "trumped up" "construct" of lawyers and accountants based on suborned perjury?

Given that the pervading theme of Rustin's jury argument was that appellants' entire case "is a lawyer's construct, *it is*

created by lawyers,*" and Rustin's case was not, the trial court's and the majority's findings that the inflammatory argument was "short in duration" and was "not repeated" are objectively and clearly erroneous. However, the record does reveal, as found by the trial court, that House "concocted" her argument that Abel suborned perjury.[3] There is no evidence in the record supporting an inference that Able met with Valeriano and suborned perjury and "trumped up" a claim. The argument was neither invited nor provoked, and it injected the new, inflammatory, and unsupported charge of suborned perjury into the case. Calculated to cause the rendition of an improper judgment, the inflammatory argument called into question the ultimate integrity of the fact-finding process and was particularly egregious.

The "improper, inflammatory jury argument," along with House's assertions that appellants' entire case was a "trumped up claim" and a "construct" of their "lawyers and accountants," irretrievably prejudiced appellants' case. *See Howsley & Jacobs,* 376 S.W.2d at 566. Thus, the argument's harmfulness, i.e., its "reversible impact," could not be cured. *Guerrero,* 800 S.W.2d at 864. Indeed, this Court has previously explained that a similar charge "by [an] appellee's counsel to the effect that [an] appellant's entire case was based upon perjury and manufactured testimony, to which his counsel was a party, could scarcely have done other than result in harm." *Cross v. Houston Belt & Terminal Ry. Co.,* 351 S.W.2d 84, 87 (Tex.Civ. App.-Houston 1961, writ ref'd n.r.e.).[4] Accordingly, the majority seriously errs in concluding that Ms. House's "reprehensi-

---

3. A person commits the third degree felony offense of aggravated perjury if he makes a false, material statement under oath during or in connection with an official proceeding. TEX. PEN.CODE ANN. § 37.03 (Vernon 2003).

4. It should be noted that some courts have concluded that "incurable harm" from a jury argument does not necessarily equate to "reversible harm." *See Manon v. Solis,* 142 S.W.3d 380, 391 n. 6 (Tex.App.-Houston [14th Dist.] 2004, pet. denied). However, this

ble" comments "were curable" and holding that appellants "waived this error." Likewise, it errs in concluding, alternatively, that her "improper, inflammatory" jury argument did not harm appellants' case.

## Conclusion

I would hold that the "reprehensible" and "improper, inflammatory jury argument" made by Rustin's trial counsel was incurable and thus, that it probably caused the rendition of an improper judgment. *See* TEX.R.APP. P. 44.1(a)(1). I would further hold that the trial court abused its discretion in denying appellants' motion for new trial. Accordingly, I would sustain appellants' first issue, reverse the judgment of the trial court, and remand the case for a new trial.

The majority's decision to the contrary is in serious error. The majority's opinion, based on its interpretation of *Reese*, will actually encourage more such improper arguments, "for what is permitted is considered proper." Roger D. Townsend, 67 TEX. B.J. at 454. If appellate courts are inclined to find such an "improper, inflammatory jury argument" to actually be curable, why not "take the gloves off," engage in such inflammatory displays, and bias and prejudice the jury against your opponent? *See id.* Importantly, although such "improper arguments work," they take a great toll on the public's perceptions of

lawyers and our jury trial system. *Id.* at 453. Improper arguments confirm for real jurors in real Texas courtrooms the worst caricatures of lawyers and our justice system that television and movies have to offer.

Ultimately, trial judges have the duty to enforce "law and order, as well as dignity, in their courtrooms." *Id.* at 454. Indeed, trial courts need not "wait for objections to be made when the rules as to arguments are violated." TEX.R. CIV. P. 269(g). "Mere personal criticism by counsel upon each other" in argument "shall be promptly corrected as a contempt of court." TEX.R. CIV. P. 269(e). Appellate justices also have important duties as illustrated by this case. As noted by Townsend,

> When [judges] abdicate [their] duty, professionalism suffers even more than when a lawyer makes an improper argument, for what is permitted is considered proper by the jury. *All judges who do not stop improper arguments—* and all trial lawyers who make improper arguments—have no business lamenting the public's low perception of lawyers. They need only look in the mirror.

Roger D. Townsend, 67 TEX. B.J. at 454 (emphasis added).

Court, in a criminal case, has previously noted the incongruity of determining whether an "incurable" improper jury argument is "harmful" or "harmless." *Thompson v. State,* 89 S.W.3d 843, 853 (Tex.App.-Houston [1st Dist.] 2002, pet. ref'd). After all, "incurable" is defined as "[n]ot admitting of remedy, correction, or reformation." THE COMPACT OXFORD ENGLISH DICTIONARY 835 (2d ed.1991). Nevertheless, controlling authority in criminal cases actually requires a harmless error analysis even when an appellate court concludes that an improper argument is "incurable." *Thompson,* 89 S.W.3d at 853.

In contrast, as pointed out in *Guerrero,* controlling authority in civil cases recognizes that in certain instances, although rare, a harmless error analysis need not be performed when the harm from an improper argument is "incurable." 800 S.W.2d at 864. The court, in *Guerrero,* emphasized that the supreme court, in *Reese,* equated the term "incurable" with "harmful." *Id.* The "notion of 'cure' refers to removing the argument's *harmful effect." Id.* The supreme court has specifically recognized that appeals to racial prejudice and "unsupported charge[s] of perjury" are "incurable." *Reese,* 584 S.W.2d at 840.