In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

**NO. 09-11-00545-CV**

_____

**IN THE INTEREST OF A.B.G.**

**On Appeal from the 410th District Court**
**Montgomery County, Texas**
**Trial Cause No. 10-02-01547-CV**

## MEMORANDUM OPINION

Appellant, M.B.G., appeals the trial court's judgment awarding the parties joint managing conservatorship and granting appellee, P.A.R.O., the exclusive right to designate the primary residence of the minor child, A.B.G. On appeal, M.B.G. challenges the trial court's exercise of its jurisdiction, contends improper evidence was admitted at trial, and argues that improper arguments were made during closing. We affirm the judgment of the trial court.

P.A.R.O. met M.B.G. in May 2008 in Mexico City where M.B.G. lived with her parents. In August 2008, the couple began discussing marriage and trying to conceive a child. In September 2008, M.B.G. learned that she was pregnant. Shortly thereafter, P.A.R.O. proposed to M.B.G. They became engaged and began planning their wedding.

1

For reasons that are unclear from the record, thereafter the relationship quickly deteriorated. In October 2008, following an argument with P.A.R.O., M.B.G. went to Texas to stay in her parents' vacation home. Roughly a week later, M.B.G. changed her Facebook status to indicate that she was no longer engaged. At the time, M.B.G. was approximately five weeks pregnant. P.A.R.O. and M.B.G. did not reconcile and were never married.

After M.B.G. went to Texas, she cut off communication with P.A.R.O. P.A.R.O. worried that M.B.G. might give the child up for adoption without his consent or abort the pregnancy without his knowledge. Unable to communicate with M.B.G., P.A.R.O called M.B.G.'s parents and asked for information about the pregnancy, but M.B.G.'s parents would not speak with P.A.R.O. or give him any information. At trial, P.A.R.O. presented extensive evidence of his attempts to gain information from M.B.G.'s family about M.B.G. and their unborn child during the course of her pregnancy. P.A.R.O. explained that he did not know if M.B.G. had continued the pregnancy until March 2009, when he located her name on a baby shower registry at a mall in Mexico City. Thereafter, P.A.R.O. wrote letters to M.B.G. and to M.B.G.'s obstetrician requesting information related to the health and sex of the unborn child, and stating that he wished to be present when the child was born. P.A.R.O. received no response. A.B.G. was born in Texas on May 31, 2009. Roughly one month after the child was born, through the use of a private investigator, P.A.R.O. learned the child's name, sex, and date of birth.

2

P.A.R.O. filed a criminal complaint in Mexico against M.B.G. with the central agency dedicated to the protection of minors.[1] In his complaint, P.A.R.O. made various allegations against M.B.G. regarding her conduct toward him and the child.[2] P.A.R.O. learned that M.B.G. and A.B.G. were living in Texas. As a result of the investigation regarding the criminal complaint, P.A.R.O. was able to obtain copies of A.B.G.'s birth certificates from Mexico and Texas, neither of which listed a father. In December of 2009, after learning that there was no father listed on A.B.G.'s birth certificates, P.A.R.O. filed suit to establish paternity in Mexico. M.B.G. was served with process by publication. On February 17, 2010, P.A.R.O. filed the underlying Petition to Adjudicate Parentage in Montgomery County, Texas. M.B.G. answered the Texas suit and filed a counter-petition seeking to be appointed the sole managing conservator of A.B.G.

Thereafter, P.A.R.O. nonsuited his SAPCR, challenged the jurisdiction of the Texas court, and filed a petition pursuant to the Hague Convention seeking to have A.B.G. sent to Mexico. In July 2010, the trial court entered an emergency order. The

[1] In the criminal complaint, P.A.R.O. alleged that M.B.G. had informed him that she had contracted a sexually transmitted disease from a previous relationship and that she refused to provide him with test results to demonstrate that she was successfully treated after she became pregnant, that he did not know if she had been treated at the time of A.B.G.'s birth, that the relationship between M.B.G. and her father was inappropriate and dysfunctional such that it could affect the well-being of A.B.G., that M.B.G. had hidden all information related to the child from P.A.R.O. and dismissed his rights as the child's father, that M.B.G. refused to accept money from P.A.R.O. to pay for the preservation of the child's umbilical cord blood, that he feared the child was being neglected.

[2] At the time of trial, the criminal complaint P.A.R.O. filed in Mexico was still pending.

3

trial court ordered that the parties undergo genetic testing to determine paternity, that the child remain in Texas in the possession of M.B.G., and that P.A.R.O. have a supervised visit with the child. P.A.R.O. met A.B.G. for the first time in July 2010 at the supervised visit in Texas. A.B.G. was fourteen months old.

The parties briefed the jurisdictional issue and the trial court entered an order confirming its jurisdiction.[3] The trial court denied P.A.R.O.'s petition for return of A.B.G. to Mexico under the Hague Convention. The trial court entered separate findings of fact and conclusions of law, concluding it had jurisdiction over the proceedings. In August 2011, the case proceeded to trial. The jury found that the parties should be appointed as joint managing conservators, and P.A.R.O. should have the exclusive right to determine the primary residence of A.B.G., within specified geographic areas located in the United Mexican States, and the trial court entered its judgment accordingly. M.B.G. filed a motion for new trial and motion for judgment notwithstanding the verdict, which were denied by the trial court. This appeal followed.

M.B.G. argues on appeal that the trial court erred in exercising jurisdiction because it did not have dominant jurisdiction, erred in allowing improper evidence to be

---

[3] P.A.R.O. filed a petition for writ of mandamus in this Court asserting that the trial court abused its discretion in exercising jurisdiction of the child custody proceedings under the Uniform Child Custody Jurisdiction Enforcement Act (UCCJEA). *See In re Ojeda*, No. 09-10-00446-CV, 2010 WL 4264402 (Tex. App.—Beaumont Oct. 28, 2010, orig. proceeding) (mem. op.). We denied P.A.R.O.'s petition for writ of mandamus. *See id*.

admitted, and erred in allowing improper closing argument. We affirm the judgment of the trial court.

## I. JURISDICTION

Whether a trial court has subject-matter jurisdiction is a question of law reviewed by an appellate court under a de novo standard. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004); *Powell v. Stover*, 165 S.W.3d 322, 324-25 (Tex. 2005) (orig. proceeding). Subject-matter jurisdiction may not be waived or conferred by estoppel. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445-46 (Tex. 1993); *Seligman-Hargis v. Hargis*, 186 S.W.3d 582, 585 (Tex. App.—Dallas 2006, no pet.). Section 152.201(a) of the Family Code provides:

(a) Except as otherwise provided in Section 152.204, a court of this state has jurisdiction to make an initial child custody determination only if:

(1) this state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state;

(2) a court of another state does not have jurisdiction under Subdivision (1), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under Section 152.207 or 152.208, and:

(A) the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and

5

(B) substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships;

(3) all courts having jurisdiction under Subdivision (1) or (2) have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under Section 152.207 or 152.208; or

(4) no court of any other state would have jurisdiction under the criteria specified in Subdivision (1), (2), or (3).

Tex. Fam. Code Ann. § 152.201(a) (West 2008). The Family Code defines "Home state" as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding." *Id*. § 152.102(7). The temporary absence of a parent is part of the consecutive period. *Id*.

Section 152.206 addresses simultaneous proceedings. *Id.* § 152.206. Section 152.206 provides that a Texas court may not exercise jurisdiction if, at the time of commencement of the Texas proceeding, "a proceeding concerning the custody of the child has been commenced in a court of another state having jurisdiction substantially in conformity" with the UCCJEA, unless the other proceeding is terminated or is stayed by that court because Texas is a more convenient forum under section 152.207. *Id*. § 152.206(a). Section 152.206 further provides that if a Texas court determines that a child custody proceeding has been commenced in another state "having jurisdiction substantially in accordance" with the UCCJEA, the Texas court must stay its proceeding and communicate with the court of the other state. *Id*. § 152.206(b). If the court of the

6

other state does not determine that Texas is a more appropriate forum, the Texas court must dismiss the case. *Id.* In applying the UCCJEA, Texas courts are required to treat a foreign country "as if it were a state of the United States[.]" *Id.* § 152.105(a).

On appeal, and contrary to the position she took in the trial court, M.B.G. argues that the trial court erred in exercising jurisdiction because the court in Mexico had dominant jurisdiction. M.B.G. does not contend that the trial court erred in determining that Texas was A.B.G.'s home state, nor does she challenge the trial court's findings of fact relevant to this issue. Rather, M.B.G. argues that while the trial court "correctly found" that Texas was A.B.G.'s home state, and that it had jurisdiction, the court's exercise of that jurisdiction was improper because the suit in Mexico was filed first. M.B.G. further asserts that section 152.206 "*does not* permit" the Texas court to determine whether the court in Mexico actually has jurisdiction in conformity with the UCCJEA. Instead, M.B.G. contends that the issue turns on whether the court in Mexico "subscribes to the UCCJEA" or a statute in substantial conformity with the UCCJEA. According to M.B.G., even if Mexico did not have jurisdiction, the Texas Court was obligated to stay its proceedings and communicate with the court in Mexico to allow the court in Mexico to determine if Texas was a more appropriate forum because (1) the trial court found that Mexico subscribes to the UCCJEA, and (2) the suit in Mexico was filed first. M.B.G.'s argument misconstrues the application of sections 152.201 and 152.206.

The purpose of the simultaneous proceeding statute is to deal with situations where a Texas court and the court of another state are "both *legitimately* exercising

7

custody jurisdiction at the same time." *In re J.P.L.*, 359 S.W.3d 695, 710 (Tex. App.—

San Antonio 2011, pet. denied) (emphasis added); *Waltenburg v. Waltenburg*, 270

S.W.3d 308, 314 (Tex. App.—Dallas 2008, no pet.) (quoting *In re McCoy*, 52 S.W.3d

297, 305 (Tex. App.—Corpus Christi 2001, orig. proceeding [mand. denied])).[4] The

UCCJEA prioritizes home state jurisdiction. *See Powell*, 165 S.W.3d at 325; *see also*

Tex. Fam. Code Ann. § 152.201. If Texas is the home state of A.B.G., no other state can

legitimately have jurisdiction substantially in conformity with the UCCJEA. *See In re*

*E.K.N.*, 24 S.W.3d 586, 592 (Tex. App.—Fort Worth 2000, no pet.) (recognizing that

because Texas was the home state and the UCCJEA gives priority to home state

jurisdiction, "the Los Angeles County Superior Court could not have exercised

jurisdiction in substantial conformity with Chapter 152."); *see also In re Burk*, 252

S.W.3d 736, 741 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (concluding that

because Texas was the home state, the Colorado court did not have jurisdiction in

substantial conformity with Chapter 152); *see also* Tex. Fam. Code Ann. §§ 152.201(a),

(b), 152.206(a). Therefore, from a practical standpoint, the simultaneous proceeding does

not arise under the circumstances at issue because Texas is the home state. *See E.K.N.*,

---

[4] We note that former section 152.006(a) stated, "A court of this state may not exercise its jurisdiction under this chapter if, at the time of filing the petition, a proceeding concerning the custody of the child was pending in a court of another state *exercising* jurisdiction substantially in conformity with this chapter[.]" The statute was amended and the language was changed from "*exercising* jurisdiction substantially in conformity" to "*having* jurisdiction substantially in conformity." Act of April 6, 1995, 74th Leg., ch. 20, § 1, sec. 152.006, 1995 Tex. Gen. Law 113, 142-43 (amended and recodified 1999) (current version at Tex. Fam. Code Ann. § 152.206 (West 2008)) (emphasis added).

24 S.W.3d at 592; *Burk*, 252 S.W.3d at 741; *see also* Tex. Fam. Code Ann. §§ 152.201, 152.202, 152.206; *cf. Powell*, 165 S.W.3d at 327-28 (concluding that regardless of the child's significant connections to Texas, the Texas court must stay its proceedings to communicate with and defer to the trial court in Tennessee, which was the child's home state). Because M.B.G. does not contest the trial court's finding that Texas is A.B.G.'s home state and this finding is supported by the record, we conclude the trial court did not abuse its discretion in exercising its jurisdiction without staying the proceedings to communicate with the court in Mexico. *See* Tex. Fam. Code Ann. §§ 152.201, 152.206; *see also Wells Fargo Bank N.W., N.A. v. RPK Capital XVI, L.L.C.*, 360 S.W.3d 691, 698 (Tex. App.—Dallas 2012, no pet.) ("Unchallenged findings of fact are binding on the appellate court, unless the contrary is established as a matter of law or there is no evidence to support the finding."). We overrule issue one.

## II.     IMPROPER EVIDENCE

In issue two, M.B.G. complains that P.A.R.O.'s evidence "was nothing more than a character assassination" of M.B.G. "based upon her immigration status, criminal accusations . . . and her sexuality[.]"  In issue two, M.B.G. also complains that the trial court allowed experts to provide opinions that were "legal conclusions, speculative, suffered from analytical gaps, and often involved nothing more than general knowledge[.]"  Finally, M.B.G. argues that P.A.R.O.'s closing argument was improper.

## A. Immigration Status and Criminal Accusations

M.B.G. argues that the trial court improperly allowed P.A.R.O. to present evidence regarding M.B.G.'s "alleged illegal immigration status, . . . her allegedly incestuous relationship with her father, [and] the fact that she was supposedly charged with crimes in Mexico[.]" We find M.B.G.'s argument without merit.

In support of her argument that improper immigration evidence was admitted, M.B.G. cites *TXI Transportation Company v. Hughes*, 306 S.W.3d 230 (Tex. 2010). First, we note that P.A.R.O. did not present evidence that M.B.G. was an illegal alien, nor does the record reflect that he attempted to cast her as such. Rather, P.A.R.O. presented evidence that M.B.G. was in the United States legally, but temporarily, under a student visa.[5] Second, under the circumstances of this case, the temporary nature of M.B.G.'s legal status in the United States was relevant to the determination of what custody arrangement was in the best interest of A.B.G. *Compare Hughes*, 306 S.W.3d at 241 (concluding employee's status as an illegal alien and his use of a fake social security number to obtain a commercial driver's license were irrelevant to negligent entrustment and negligent hiring claims in wrongful death action). Finally, M.B.G. has not properly preserved this issue for our review. M.B.G. failed to object to any of this evidence when it was presented during trial. To preserve a complaint for review, the record must show that the moving party presented the complaint to the trial court by a timely motion,

---

[5] Evidence was also presented that when M.B.G. first came to the United States she was on a tourist visa, which she later changed to a student visa.

10

request, or objection and obtained a ruling. Tex. R. App. P. 33.1; *see also* Tex. R. Evid. 103(a)(1) (stating error may not be predicated upon a ruling admitting evidence unless a substantial right of the party is affected and a timely, specific objection or motion to strike appears in the record). M.B.G. failed to preserve any error with regard to the admission of this evidence. *Id.*

P.A.R.O. testified that he made criminal allegations against M.B.G. in Mexico. In addition to allegations related to M.B.G.'s efforts to conceal the child, P.A.R.O. alleged that M.B.G. knew she was infected with a sexually transmitted disease from a prior relationship and engaged in a sexual relationship with P.A.R.O. without telling him about the disease.[6] This testimony was also admitted without objection. P.A.R.O.'s father testified at trial that in the beginning he had doubts as to whether the unborn child was P.A.R.O.'s, and he believed that A.B.G. "could have been the child of an incestual relation." Again, this evidence was admitted without objection from M.B.G. M.B.G. acknowledges on appeal, "that there are preservation of error issues" with regard to her evidentiary complaints. M.B.G. asserts, however, that the nature of the errors vitiates the need for objections to the challenged evidence. We disagree. We conclude that M.B.G. has failed to preserve these complaints for review. Tex. R. App. P. 33.1; Tex. R. Evid. 103(a)(1).

---

[6] P.A.R.O. explained that Mexican authorities had not yet "accepted" any criminal charges against M.B.G.

11

## B. Expert Testimony

M.B.G. also argues in issue two that the trial court allowed improper expert testimony from the following four witnesses: Raed Gonzalez, Francisco Pena, Ronald Massey, and Norma Willcockson.

Raed Gonzalez, an immigration attorney, testified regarding the nature of B-1, B-2, and F-1 visas. On appeal, M.B.G. argues that Gonzalez's testimony was an improper recitation of immigration law, amounted to no evidence, was irrelevant, conclusory, and constituted speculation. At trial, Gonzalez testified that he has been an immigration attorney for twelve years, licensed in Texas and Puerto Rico. He testified that he primarily works as an expert in immigration law. He stated that he has extensive experience in helping Mexican citizens obtain visas to the United States, and in defending Mexican citizens in litigation regarding their visas. Gonzalez explained B-1 (business) and B-2 (tourist) visas to the jury. He testified that someone holding one of these visas is not coming to the United States to become a legal permanent resident that is, the person lacks "immigrant intent." Gonzalez also testified that an F-1 student visa is temporary. Gonzalez explained that on the expiration of a student visa, the visa holder must leave the United States. Gonzalez stated that it would constitute a fraud against the government to come to the United States under one of these visas with the intent to permanently reside here. Gonzalez testified that there are other types of visas, which allow for the dual intent of entering the United States temporarily with the potential to become a permanent resident at some point in the future. However, according to Gonzalez, the F-1 student

12

visa, under which M.B.G. was in the United States, is not one of those. Therefore, at the time of trial M.B.G.'s legal status, under an F-1 student visa, was such that she would eventually be required to change or extend her visa, or leave the United States. [7]

It is generally improper for an expert to testify directly on pure questions of law. *Greenberg Traurig of New York, P.C. v. Moody*, 161 S.W.3d 56, 94 (Tex. App.— Houston [14th Dist.] 2004, no pet.). However, M.B.G. did not object to Gonzalez's testimony at trial. M.B.G. argues that it was unnecessary to object to his testimony to preserve error. "Bare, baseless opinions will not support a judgment even if there is no objection to their admission in evidence." *City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009). In *Pollock*, the Court held that the expert's opinions that the defendant acted with conscious indifference "were simple assertions with no basis at all." *Id.* at 817. However, Gonzalez's testimony is not conclusory or baseless. It is based on his training and experience with the federal immigration regulations. Because she failed to object to his testimony, M.B.G. did not preserve this issue for review. Tex. R. App. P. 33.1.

Moreover, to reverse a judgment based on erroneously admitted evidence, the complaining party must show that "the judgment turns on the particular evidence admitted." *Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004). The erroneous admission of evidence "is harmless if it is merely cumulative" of other

---

[7] Though M.B.G. was living in Texas pursuant to a student visa at the time of trial, she testified it was her intent to raise A.B.G. in the United States if she is able to obtain a work visa when she completes her studies.

evidence admitted at trial. *Id.* The judgment in this case did not turn on the nature of M.B.G.'s immigration status. The temporary nature of M.B.G.'s status in the United States was merely one fact put before the jury and relevant to a determination of what custody arrangement was in the best interest of A.B.G. Additionally, Gonzalez's testimony was cumulative of extensive other evidence in the record, including copies of M.B.G.'s visas and her own testimony regarding the nature of her status in the United States.[8] Therefore, any error by the admission of this testimony was harmless. *See id.*; Tex. R. App. P. 44.1(a)(1).

Francisco Pena, an attorney licensed in Mexico, and certified by the Texas Bar as a foreign legal consultant, testified regarding the central agency in Mexico dedicated to the protection of minors, at which M.B.G. was detained for questioning in conjunction with the criminal complaint P.A.R.O. filed against her. Pena testified that he practices in Mexico City. He further testified that he is familiar with the Mexican agency dedicated to the protection of minor children, which is the equivalent of child protective services in the United States.

---

[8] Copies of M.B.G.'s tourist and student visas were admitted into evidence during trial. M.B.G. testified that she was born in Mexico, obtained the equivalent of a bachelor's degree in Mexico, and lived there for twenty years before she moved to the United States at the end of March 2009. M.B.G. testified that she originally came to the United States on a tourist visa and later changed to a student visa. She testified that she was still in the United States under her student visa, and asserted that her visa would allow her to live and study in the United States for three more years. At the time of trial, M.B.G.'s legal status in the United States was of a temporary nature.

M.B.G. argues on appeal that Pena had no personal knowledge of the matters to which he testified at trial, was improperly cast as an expert witness, and that his testimony amounts to "no evidence." M.B.G. only objected to Pena's testimony on the basis that he was "being offered as an expert on the areas of Mexican law, [and] family law." However, the trial court ruled that Pena could not testify regarding his understanding of the law. M.B.G. did not object to Pena's testimony on the basis that he lacked personal knowledge, was unqualified to testify, or was improperly designated. In fact, counsel expressly stated he was not objecting to Pena's qualifications. M.B.G. has not preserved this complaint for review. *See* Tex. R. App. P. 33.1. Additionally we note that Pena's testimony was brief and was introduced only to rebut testimony from M.B.G. regarding events that M.B.G. alleged occurred in Mexico as a result of P.A.R.O.'s criminal complaint against her. This was not a material issue in the case. Because the judgment did not turn on this evidence, any error by its admission was also harmless. *See* Tex. R. App. P. 44.1(a)(1); *Armstrong*, 145 S.W.3d at 144.

P.A.R.O. also presented Ronald Massey, a clinical psychologist, to testify regarding P.A.R.O.'s interaction with A.B.G., and his opinion regarding the potential appointment of P.A.R.O. as sole managing conservator of A.B.G. Massey testified regarding his experience performing forensic evaluations in conjunction with child custody matters. M.B.G. stipulated that Massey is an expert in his field. Massey stated that he reviewed the pleadings, interviewed P.A.R.O. three times, and observed videotapes of P.A.R.O's supervised visits with A.B.G. However, Massey explained that

15

he did not perform a full custody evaluation in this case because he did not interview M.B.G. or A.B.G.

Massey testified that he performed the Minnesota Multiphasic Personality Inventory, Edition II (MMPI-II) on P.A.R.O. He explained that this test is commonly used to measure psychopathology, mental health problems, and to some extent personality. Massey explained the factors that are considered by the MMPI-II in detail. Massey testified that P.A.R.O. scored "right at the same [range] as [you would] expect any normal person." He further opined that there was "no indication at all of any clinical mental health problem." Massey further testified based on his interviews with P.A.R.O. that he did not see anything that would prevent P.A.R.O. from having custody of A.B.G. Massey testified, based on his observations of P.A.R.O. interacting with A.B.G., that "although he's not had a lot of visitation with [A.B.G.] at all, that you can see that there was a very good connection there [between P.A.R.O. and A.B.G.] and they were responding to each other emotionally quite well." Massey testified, based on his interviews with P.A.R.O., he believed P.A.R.O. had gone through a lot to have access to A.B.G. and be part of his life. Massey stated that he saw "absolutely nothing to suggest, hint, or cause a worry that [P.A.R.O.] would need supervised visitation [with A.B.G.]."

Massey further testified regarding the importance of a child having both his mother and father in his life, especially at a young age. Massey testified it would be "[e]xtremely [d]ifficult" for a child to have frequent and continuing time with both parents if they lived 1500 miles apart. Massey stated that proximity of a child's parents

16

to one another is a "very important consideration" in determining the best interest of the child, but is "not the only consideration." Based on the information he obtained, Massey concluded that having one parent in Mexico and one in Texas was not in the best interest of A.B.G. Massey further testified that co-parenting was important and stated he believed that P.A.R.O. could foster a positive relationship with M.B.G. and her family.

M.B.G. argues on appeal that Massey's testimony is unreliable. Specifically, M.B.G. argues that Massey improperly based his assessment on the videos of P.A.R.O.'s supervised visits with A.B.G., used a psychological test that is not appropriate or relevant in a custody case, and improperly relied on pleadings. The bulk of these complaints challenge the information Massey relied on in drawing conclusions and forming his opinions. M.B.G. did not object to Massey's testimony on the basis that it was unreliable, or that his methodology was flawed. Therefore, she has waived these complaints. Tex. R. App. P. 33.1; *Coastal*, 136 S.W.3d at 233 ("[W]hen a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made[.]"). M.B.G. argues additionally that Massey's testimony was conclusory and speculative and that the "record is silent as to [the] bases" of his opinions. We disagree. Massey explained the bases of his testimony and linked his conclusions to the facts and data he reviewed in conjunction with this case.

Norma Willcockson testified regarding P.A.R.O's supervised visits with A.B.G. Willcockson explained that she is the executive director for Guardians of Hope, a private company that monitors parents during supervised visitations. Willcockson testified that

17

she monitored one of P.A.R.O.'s supervised visits with A.B.G., and her employees monitored the other two supervised visits. Guardians of Hope prepared a report of the supervised visits, which was admitted into evidence. Willcockson testified from the report regarding what occurred during the supervised visits. Willcockson testified that the visits took place on July 17, 2010, and a year later on July 16, 2011, and July 17, 2011. Willcockson testified that at the final visit, A.B.G. cried when M.B.G. handed A.B.G. to the person monitoring the visit, but that he quit crying as soon as he saw P.A.R.O. and appeared happy to see his dad. Willcockson testified that the report indicated that P.A.R.O. and A.B.G. had bonded during their visit the previous day. Willcockson further testified that she did not see anything out of the ordinary during P.A.R.O.'s interaction with A.B.G.

On appeal, M.B.G. argues that Willcockson was a fact witness improperly cast as an expert witness, and that her opinion was speculative and conclusory. M.B.G. failed to object to Willcockson's testimony at trial.[9] Therefore, her complaint that Willcockson was improperly cast as an expert is not preserved for review. Tex. R. App. P. 33.1. Willcockson testified based on her own observations and the observations of her employees, set forth in detail in a written report that was admitted into evidence without objection.

---

[9] M.B.G's counsel only objected once, on unrelated grounds, during the direct examination of Willcockson.

18

We find M.B.G.'s complaints regarding the testimony admitted at trial were not preserved.

### C. Closing Argument

In issue two, M.B.G. argues that P.A.R.O.'s counsel made improper statements during closing argument. M.B.G. argues that P.A.R.O.'s counsel made the following improper arguments during closing:

1.  Informed the jury of the effect of their answers to special issues and improperly appealed to the jury to find for P.A.R.O. on the special issues by urging the jury to "[choose P.A.R.O.]," and to "give this man sole custody and give this child the opportunity to have a family with both mother and father and both sets of grandparents in Mexico[,]" stating, "we would like for the father to have the right to determine the child's primary residence."

2.  Called on the jury to right the wrong of P.A.R.O.'s lost time with A.B.G. and to punish M.B.G. by stating, the "mother wants you to separate and tear the heart out of this child . . . I'm going to ask you to give this man sole custody[,]" and improperly speculating that if M.B.G. got custody she may take the child to another country. ("You heard her talk about Ireland and Canada and these other places in the world where she's been. So where will she go? Where will she take this child? There is a lot of danger there.")

3.  Referencing or commenting on criminal proceedings pending against M.B.G. in Mexico and misleading the jury to believe that a crime had actually been charged, arguing that after the agency in Mexico placed A.B.G. into the temporary custody of M.B.G.'s father, M.B.G. took A.B.G. across the border into Texas, stating "[a]nd when she did that, she violated the law in Mexico. And it takes time for Mexico to prepare those charges and to bring it. But she violated the law and she's facing a lot of trouble there." Further arguing, "she's been here hiding out with the child since, retaining the child from the father and keeping herself away from Mexican authorities."

19

4.     Was critical and abusive during closing by calling M.B.G. "a spoiled little brat" and by stating "there is something called smoke and mirrors and there is something called pathological lying and I think this case smacks of both[.]" Additionally, in arguing "Here is another lie. She says [P.A.R.O.] was flirting with the supervisor."

5.     Appealed to racial or national prejudices by referencing M.B.G.'s temporary immigration status, arguing that her actions have violated her visa, and arguing that the government could prevent her from returning to the United States if they found she was in violation of her visa.

In *Jones v. Republic Waste Services of Texas, Limited*, the Court stated that for a complainant to obtain a reversal of judgment based on improper jury argument, the complainant must prove:

> (1) an error; (2) that was not invited or provoked; (3) that was preserved at trial by a proper objection, motion to instruct, or motion for mistrial; (4) that was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the trial court; and that (5) the argument by its nature, extent, and degree constituted reversibly harmful error. Reversal is proper only upon a showing that 'the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence.'

236 S.W.3d 390, 401 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (quoting *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 840 (Tex. 1979)) (internal citation omitted).

M.B.G. did not object to P.A.R.O.'s closing argument at trial. Because M.B.G. failed to object to the closing argument, M.B.G. must show that the complained of statements constituted incurable jury argument. *See Jones*, 236 S.W.3d at 402. Whether an argument is incurable depends on the degree of prejudice imparted by the argument,

20

and whether the argument was reasonably calculated to cause irreversible prejudice to the opposing party. *Id.* at 403. Generally, retraction of an argument or an instruction to disregard the argument from the trial court can cure any probable harm. *Living Centers of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008). "Only rarely will an improper argument so prejudicially influence the jury that the error cannot be cured." *Jones*, 236 S.W.3d at 403.

P.A.R.O.'s counsel's closing argument was harsh and insulting at times. Counsel called M.B.G. "a spoiled little brat." She argued that M.B.G. was in her thirties and still being supported by her parents. Though counsel characterized M.B.G.'s assertion that P.A.R.O. spent his first supervised visit with A.B.G. flirting with the supervisor as a "lie[,]" there was evidence in the record that supported counsel's contention that this assertion was untrue. While P.A.R.O.'s counsel referred to M.B.G.'s arrest and detention in Mexico in conjunction with the criminal case pending against her, multiple facts were admitted into evidence regarding the occurrence of this event. There was also evidence in the record establishing that M.B.G. brought A.B.G. back to Texas after she was detained and learned of the criminal proceedings pending against her in Mexico. M.B.G. argues that counsel for P.A.R.O. "speculated that if [M.B.G.] got custody, she would flee to Ireland or Canada . . . encouraging the Jury to prevent that 'abduction.'" However, M.B.G.'s argument mischaracterizes counsel's statements. P.A.R.O.'s counsel alluded to the uncertainty of A.B.G.'s primary residence and the stability of his life if M.B.G. was given sole custody or the right to designate the primary residence, stating:

21

[I]f we're thinking about the emotional and physical danger to [A.B.G.] now and in the future, if we can give the child to [M.B.G.], what's going to happen? Where is she going to go? She can't stay here. She's going to have to leave within a year. She may have to leave a lot earlier if the government finds out about her statements and what she's done. And then if she goes back to Mexico, what's going to happen there if she gets in trouble with the law right away? . . . And maybe she doesn't want to go back to Mexico. You heard her talk about Ireland and Canada and these other places in the world where she's been. So where will she go? Where will she take this child?

There is a lot of danger there. We don't know what [M.B.G.] will do, but we know what [P.A.R.O.] will do. We saw his house. We know that he has a stable home. We know he has a job there in Mexico.

This argument was based on facts introduced into evidence establishing that a criminal complaint was pending against M.B.G. in Mexico, that her legal status in the United States was temporary, and that she had kept A.B.G. from having contact with P.A.R.O. for the first fourteen months of his life by moving him to another country.

In addition, though some of the complained of statements may be directed to considerations outside of the jury charge, M.B.G. has not shown, under the circumstances of this case, that they caused incurable harm.

The party claiming incurable harm must persuade the court that, based on the record as a whole, the offensive argument was so extreme that a juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument.

*Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009) (internal quotation marks omitted). On this record, we are not persuaded that the arguments M.B.G. challenges are

22

so extreme, unsupported, and of an inflammatory nature and magnitude that they constitute incurable error. We overrule issue two.

Having overruled all M.B.G.'s appellate issues, we affirm the judgment of the trial court.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on September 27, 2012
Opinion Delivered January 24, 2013

Before Gaultney, Kreger, and Horton, JJ.